IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs March 2, 2010

## JOHNNY MENIFEE v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Maury County**
**Nos. 13869, 13870      Stella L. Hargrove, Judge**

---

**No. M2009-00446-CCA-R3-CD - Filed March 11, 2010**

---

The petitioner, Johnny Menifee, was convicted in 2004 of Class D felony evading arrest with risk of injury, misdemeanor theft, Class E felony reckless endangerment with a deadly weapon, and resisting arrest. He received an effective sentence of eighteen years as a persistent offender. After his convictions and sentences were affirmed by this court in 2006, he filed a petition for post-conviction relief. Following an evidentiary hearing, the post-conviction court denied the petition; and, after our review, we affirm that denial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which JOSEPH M. TIPTON, P.J., and JOHN EVERETT WILLIAMS, J., joined.

Ronald G. Freemon, Columbia, Tennessee, for the appellant, Johnny Menifee.

Robert E. Cooper, Jr., Attorney General and Reporter; Matthew Bryant Haskell, Assistant Attorney General; T. Michel Bottoms, District Attorney General; and Daniel J. Runde, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### FACTS

In the opinion affirming the convictions of the petitioner, this court set out the facts upon which the convictions were based:

> On April 22, 2003, Elizabeth Fox drove her 1998 Ford Mustang onto the Kroger parking lot and entered the Farmer's and Merchant's Bank, leaving

the keys in her car. Fox was in the bank only briefly and, upon returning to her car, found it missing. She reported the theft to the Columbia Police Department, and a BOLO was issued to all officers, which included the car's license plate number.

Moments later, Sergeant Blair and Officer Shannon of the Columbia Police Department were refueling their patrol cars when Blair observed a 1998 silver Mustang drive by and noted that a portion of the license plate number matched that of the vehicle reported stolen. Blair was able to catch up with the Mustang and confirmed that the license plate number was the same as reported stolen. He observed a black male as the driver and the sole occupant of the Mustang. However, pursuant to police department procedure, Blair did not activate his emergency equipment until other officers were in position as backup. As the [petitioner] drove the Mustang onto the shopping center parking lot at Columbia Plaza, Blair noticed that Officer Shannon had arrived and had positioned his patrol car to block an exit of the shopping center. At this point, Blair proceeded to activate his blue lights and sirens. The [petitioner] refused to stop and proceeded through the parking lot at a high rate of speed, veering towards Shannon's patrol car, and, only at the last minute, swerving to avoid hitting the car. The [petitioner] exited Columbia Plaza onto 7th Street, still being pursued by Sergeant Blair.

As the [petitioner] proceeded down 7th Street, he reached speeds of approximately one hundred miles per hour in an area where the posted speed limit was thirty miles per hour and veered into lanes of oncoming traffic to avoid being stopped at a traffic signal. As the [petitioner] approached the intersection of 7th Street and Garden Street, he swerved back into his own lane, but he then attempted to drive through an area reserved for parallel parking, striking a 1992 GEO Metro before crashing into a utility pole and coming to a stop.

Witnesses, including Blair, observed that only one person, the [petitioner], exited the vehicle and fled on foot. Nonetheless, upon exiting his patrol car, Blair checked the Mustang to make sure that no other occupants were inside. He then pursued the [petitioner] on foot. Officer Shannon, who had arrived on the scene as the foot chase began, proceeded down the street in his patrol car, keeping pace with the [petitioner] and Blair. Several times, Shannon used his loud speaker to tell the [petitioner] to stop. The [petitioner] continued his flight on foot, at one point jumping over two parked patrol cars. Eventually, Shannon and another officer who had arrived on the scene

managed to drive ahead and cut off the [petitioner's] escape route. After the police encountered the [petitioner], he struggled with the officers as they attempted to handcuff him. Eventually, the officers succeeded in handcuffing the [petitioner] and placed him in Shannon's patrol car. After being placed in the patrol car, the [petitioner] spat blood, saliva, and mucus upon Officer Shannon and banged his head against the door and window, yelling obscenities at the officers.

State v. Johnny C. Menifee, No. M2005-00708-CCA-R3-CD, 2006 WL 2206067, at *1 (Tenn. Crim. App. July 31, 2006), perm. to appeal denied (Tenn. Dec. 27, 2006).

In his petition for post-conviction relief, the petitioner set out a number of claims, alleging that his counsel, who represented him both at trial and on appeal, was ineffective. However, at the evidentiary hearing, he pursued only the claims that counsel did not adequately investigate the matter, did not stay in contact and meet with the petitioner as he should have done, and did not keep the petitioner advised of the trial proceedings.

The only witnesses to testify at the evidentiary hearing were the petitioner and counsel who represented him both at trial and on appeal.

Counsel testified that he had participated in "[h]undreds upon hundreds" of trials and "[h]undreds" of appeals. He said that he met with the petitioner "about four times" prior to trial. He said that he could not estimate the number of times they had spoken by telephone because records were not always made of the conversations. He said that he "had no trouble reaching [the petitioner]. He always received our notifications to be in court."

Counsel explained how he prepared the case for trial:

Would go over the State's discovery. We first, or me particularly, first evaluate the State's case. Once I have an evaluation of the State's case, fully understand the State's case, then we'll explain that to [the petitioner], and get [the petitioner's] reaction to that, and his side of explanations for what the State's case is.

He explained that the petitioner "would have been in court when the trial date would have been set. He would have been present for the setting of the trial date." He said that the petitioner had been consistent in saying that he was not the driver of the car that the police chased:

[The petitioner's] story was basically consistent throughout all the period of representation. That he was not the driver of the automobile. He was picked up in the automobile by someone he knew from a prior employment, by the name of Bobby. And that Bobby was giving him a ride home. He had been to the hospital and Bobby was giving him a ride home.

Counsel testified that, as for persons who might have testified at trial for the defense, "[t]he only witnesses that [the petitioner] had, as such, was Bobby. And we were never able to locate Bobby." Counsel explained why he was unable to locate "Bobby": "We had a first name. . . . Bob was white. Bob had, as I recall, maybe black hair. Was not very much to go on. I think when we found Mr. Stovall,[1] we found that he was gray headed and didn't have a Mustang at that particular time."

Counsel explained why he did not try to locate other witnesses: "[A]ll the occurrences allegedly occurred between the hospital and Carmack Boulevard, Garden Street. The only doors that would be available would be possibly businesses. But as far as going door to door, knocking on the businesses to see if anybody had seen anything, no, sir, I did not."

Counsel said that, prior to the trial, the State offered a term of imprisonment of six years to settle the petitioner's cases. After the petitioner rejected the offer, the State filed a notice asking that he be treated as a Range III offender. Counsel said that nothing came up during the trial that he had not anticipated and that the police officers, who were "right behind" the vehicle, did not see anyone other than the petitioner get out of the car after the chase ended. He said, however, that he pursued the defense, as the petitioner wanted, that someone else was driving the car. Counsel said that, in the discovery provided by the State, there was no evidence that another person was in the vehicle.

The petitioner testified that counsel was appointed to represent him about two months prior to the trial and that he met with counsel "about twice." He said that he tried to "catch" counsel in his office but was unsuccessful. He said that he telephoned counsel "ten or fifteen times" but only reached him "about twice." The petitioner explained that he tried to contact counsel for information about the court proceedings: "Just seeing when my court days, . . ., what they talking about in trial, . . ., or whatever they're going to do. Just trying to inform me what's going on. I usually had to come up to . . . the clerk's office just to find out my court date." The petitioner said that his meetings with counsel while they were in court lasted "[f]ive or ten minutes." He did not feel that he was able to spend as much time with counsel "as [he] needed to."

---

[1]Counsel had received information that Mr. Stovall could be the missing witness, "Bobby."

The petitioner said that, prior to trial, he was out on bond and saw "Bobby" during that time. He told counsel that he had seen "Bobby": "I told him once I did, . . . . He said, is there any kind of way I can get in touch. I told him, no, I really don't know where he live at. I just know he hangs over on the west side. I did tell him that." The petitioner said that, although there may have been other witnesses helpful to the defense, he was not able to identify them:

> [I]t was a couple of people that I could think of that probably seen Bobby, . . . and probably knew where he was at. But these people I really didn't know . . . . So, it was just like a downhill fall for me. I was trying to find out, . . ., where can I really run into him at, but they wasn't going to tell me nothing like that.

He said that he did not know of any other witnesses who could have been called to testify, other than those who did so for the State.

The petitioner said that, when he went to court on the day of his trial, he did not know that was the occasion:

> I didn't know that was my trial, . . ., all I knew, it was a court date. And the only reason I knew that was because the clerk's office told me my court date. I never did kn[o]w it was my trial date. I wasn't informed. I wasn't propped [sic] or nothing.

The petitioner said that he and counsel had not prepared for trial before the day that trial was to begin. On that day, in the courtroom, they discussed the case for "[a]bout five minutes," and he asked counsel to seek a continuance, which counsel did.

He explained what he felt could have been accomplished if he and counsel had spent more time together prior to the trial:

> I feel that if he could have let me know when my trial date was, we could have talked a bit more of what was really going on. I was really lost. I ain't know what was going on. I thought we was just coming up here, . . ., just they going to plea bargain. But it wasn't, . . ., they start picking peoples to . . . sit on the bench or something they was doing. Picking a trial, that's what they called it.

Following the evidentiary hearing, the post-conviction court filed a written order denying post-conviction relief.

After detailing the claims of the petitioner against counsel, the court found the petitioner's testimony to be "absolutely incredible," accrediting that of counsel. Thus, the court found that the petitioner had failed to show either that counsel was ineffective or had prejudiced the petitioner.

## ANALYSIS

On appeal, the petitioner argues that the trial court erred in concluding that his counsel provided effective representation. The State responds that this court should affirm the order dismissing the petition for post-conviction relief.

The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. See U.S. Const. Amend. VI; Tenn. Const. Art. I, § 9. In order to determine the competence of counsel, Tennessee courts have applied standards developed in federal case law. See State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that the same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The United States Supreme Court articulated the standard in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984), which is widely accepted as the appropriate standard for all claims of a convicted petitioner that counsel's assistance was defective. The standard is firmly grounded in the belief that counsel plays a role that is "critical to the ability of the adversarial system to produce just results." Id. at 685, 104 S. Ct. at 2063. The Strickland standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Id. at 687, 104 S. Ct. at 2064. The Strickland Court further explained the meaning of "deficient performance" in the first prong of the test in the following way:

> In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances. . . . No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant.

Id. at 688-89, 104 S. Ct. at 2065. The petitioner must establish "that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms." House v. State, 44 S.W.3d 508, 515 (Tenn. 2001) (citing Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996)).

As for the prejudice prong of the test, the Strickland Court stated: "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694, 104 S. Ct. at 2068; see also Overton v. State, 874 S.W.2d 6, 11 (Tenn. 1994) (concluding that petitioner failed to establish that "there is a reasonable probability that, but for counsel's errors, the outcome of the proceedings would have been different").

The issues of deficient performance of counsel and possible prejudice to the defense are mixed questions of law and fact and, thus, subject to *de novo* review by the appellate court. See Wiley, 183 S.W.3d at 325; State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999). The reviewing court must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance, see Strickland, 466 U.S. at 690, 104 S. Ct. at 2066, and may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. See Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). The fact that a strategy or tactic failed or hurt the defense does not alone support the claim of ineffective assistance of counsel. See Thompson v. State, 958 S.W.2d 156, 165 (Tenn. Crim. App. 1997). Finally, a person charged with a criminal offense is not entitled to perfect representation. See Denton v. State, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). As explained in Burns, 6 S.W.3d at 462, "[c]onduct that is unreasonable under the facts of one case may be perfectly reasonable under the facts of another."

We conclude that the record supports the post-conviction court's dismissal of the petition for post-conviction relief. As to how much contact there was prior to the trial between counsel and the petitioner and whether counsel adequately prepared for the trial, the post-conviction court accredited the testimony of counsel, and the record supports this determination. As to the petitioner's supposed confusion about criminal proceedings, we note that, in affirming the petitioner's convictions, we stated that the petitioner had an "extensive criminal history, spanning over two decades." Johnny C. Menifee, 2006 WL 2206067, at *2. Thus, the record also supports the post-conviction court's rejection of these claims as well.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the post-conviction court's denial of post-conviction relief.

_____
ALAN E. GLENN, JUDGE